## APPEAL OF JOHN ANTHONY BARRY.

Docket No. 1724.   Submitted July 8, 1925.   Decided October 28, 1925.

1. Advances made to a corporation and expenditures made in its behalf by a director during several years, allowed as deductions from the director's gross income in 1921 when the corporation ceased all activity, it having no assets at that time.

2. Deductions claimed for bad debts, allowed in part and disallowed in part.

*Melvin D. Wilson, Esq.*, for the taxpayer.
*Ward Loveless, Esq.*, for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

The taxpayer appeals from the determination of a deficiency of $1,206.95 in income tax for the calendar year 1921. Of the deficiency proposed only $625.15 is in controversy, as the taxpayer admits the correctness of the action of the Commissioner in disallowing a claimed deduction of $4,500 on account of salary not drawn.

The taxpayer alleges error on the part of the Commissioner in disallowing the following deductions:

(*a*) $2,900 advanced by the taxpayer to the Lenox Producing Corporation, which was never repaid.

(*b*) $1,200 expenditures, made on behalf of the Lenox Producing Corporation in an endeavor to prepare its film for the market.

(*c*) $815 living expenses, borne by the taxpayer, which were chargeable against the Lenox Producing Corporation but for which the taxpayer was not reimbursed.

(*d*) $1,000 paid for stock in the Lenox Producing Corporation which became worthless in 1921.

(*e*) $185 representing bad debts.

FINDINGS OF FACT.

1. The taxpayer is an individual residing at Los Angeles, Calif.

2. Shortly after the entry of the United States into the World War in 1917, the taxpayer produced several propaganda films. At the suggestion of a representative of the State Department, he

then made a research for several months into German history and wrote a scenario with the purpose in mind of using it as the basis of a war propaganda motion picture. It was considered by both the representatives of the United States and of England that a picture of this kind could be shown to better advantage as a private enterprise than as a Government production, and accordingly, early in 1918, the Lenox Producing Corporation was organized for the purpose of producing the picture.

3. The taxpayer purchased 10 shares of the preferred stock of the Lenox Producing Corporation for $100 per share, paid in four installments of $250 each. The company also issued to him 60 shares of its common stock. The taxpayer was a director of this company.

4. On June 20, 1918, a contract was entered into by the Lenox Producing Corporation, the Triangle Film Corporation, and the taxpayer, whereby the Triangle Corporation agreed to produce for the Lenox Corporation a motion picture based on the scenario which the taxpayer had sold to the Lenox Corporation. This picture was to be made at the Triangle studios at Los Angeles under the direct supervision of the taxpayer, who was to receive a salary of $300 per week.

5. The funds of the company were placed in the hands of the taxpayer and a representative of the Triangle Film Corporation. Before completion of the picture the Triangle Corporation became financially involved and the Lenox Corporation funds were taken over by the taxpayer and handled through a bank account designated " J. A. Barry, trustee."

6. Before the close of the year 1918 the Lenox Producing Corporation found itself in need of additional funds and decided that they could best be obtained from its officers. In pursuance of this policy the taxpayer advanced $2,200 by two checks dated December 20, 1918, in the amounts of $500 and $1,200, and one check dated December 30, 1918, in the amount of $500. These checks were drawn against the taxpayer's personal account and in favor of " J. A. Barry, trustee." He also advanced $200 by check dated December 9, 1918, payable to " Cash," and $400 by check dated March 14, 1919, payable to " Lenox Producing Corporation," for general purposes in the production and marketing of the film.

7. Within a few weeks after production of the picture was actually started, the Armistice with Germany was signed and no market existed thereafter for the picture as it was then being produced. Barry then conceived the idea of revising the picture into an Americanization film and, with the approval of the other directors and stockholders, proceeded to do so, giving the picture the name of " The Betrayal."

8. On January 11, 1919, the taxpayer paid $241.21 by check for railroad fare from Los Angeles to New York, and on January 15, 1919, paid $32.68 for Pullman accommodations from Chicago to New York. This trip was made for the purpose of taking the original completed film to New York and attempting to market it there. During January and February of 1919 the taxpayer paid hotel and living expenses in New York by checks aggregating $334.21.

9. No market was found for the picture in New York and it was later shown in Chicago at a heavy loss.

10. During 1919, Barry continued his efforts to revise the picture and reduce it from feature size of 11 reels to program size of five or six reels. On various dates between December, 1919, and April, 1921, he paid $315.41 by check to H. C. Jacobsmeyer Co. for revision work and retitling the films. He also paid $580.60 to various persons during 1918, 1919, 1920, and 1921 for services rendered in connection with the production of the film and its revision.

11. On July 31, 1920, the taxpayer paid by check $226.04 to the Los Angeles & Salt Lake Railroad Co. for transportation from Los Angeles to New York. While in New York during August, 1920, he paid hotel and living expenses amounting to $203.64. This trip to New York was made for the purpose of presenting the revised film to the Americanization Committee of the American Legion and securing its endorsement thereof before attempting to market and show the picture through individual Legion Posts. Efforts were thereafter made by representatives of the Lenox Producing Corporation to have Legion Posts and New York exhibitors show the picture, but no offers for it were received.

12. Some time in 1920 the taxpayer instructed his attorney to collect from the Lenox Producing Corporation a claim of $8,709.15. A writ of execution in that amount was issued by the Superior Court of the County of Los Angeles on June 27, 1921, in favor of the plaintiff named therein as N. A. Bray, to whom Barry's claim had apparently been assigned. Under this writ the sheriff seized the positive and negative films and prints of the picture and delivered them into the custody of John T. Barry. At the sheriff's sale of the films and prints N. A. Bray bid them in for the taxpayer at $50. The taxpayer still has the films in his possession and has never been able to realize on them. At that time the Lenox Producing Corporation had no other assets.

13. The taxpayer made the following short-time loans to individuals:

J. W. Hum, $100, by check dated July 5, 1921.

Lem Tong, $75, by check dated July 29, 1921.

Jane Grogan, $60, by check dated July 31, 1921.

92208—26——70

The taxpayer's attorney reported that there were no means of collecting the balance of $75 due on the loan to J. W. Hum. Lem Tong disappeared in 1921, leaving $30 of the loan to him unpaid. The taxpayer attempted to collect from Jane Grogan the $60 loan, but without success. She later went to New York.

14. There has been no activity on the part of the Lenox Producing Corporation or of its officers, as such, since 1921.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on consent or on 15 days' notice, in accordance with Rule 50.

### OPINION.

GRAUPNER: The taxpayer has established to our satisfaction advances made to the Lenox Producing Corporation and expenditures made on its behalf in the amount of $4,733.79, as set forth in the findings above, which he is entitled to deduct for the year 1921 in which the corporation ceased operations without assets.

The corporation having ceased all activity in 1921 and having no assets, we conclude that the taxpayer should properly be allowed his claimed deduction of $1,000 paid for capital stock of the corporation. *Appeal of Milton H. Bickley*, 1 B. T. A. 544.

Of the claimed loss on account of bad debts, we are of the opinion that the taxpayer is entitled to deduct the balance of the loans to J. W. Hum and Lem Tong amounting to $105. The evidence in regard to the loan to Jane Grogan is to the effect that she did not leave Los Angeles until after 1921 and we are not satisfied that the taxpayer definitely ascertained the debt to be uncollectible in 1921.